**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

JESSICA BRILUS and
CASSANDRA NICOLAS,

          Plaintiffs,        CASE NO.:

     v.            JURY TRIAL DEMANDED

PATRICIA BATCHELDER and
JOHN ESPINAL,

          Defendants.
_____/

## **COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs, JESSICA BRILUS (hereinafter referred to as "Plaintiff Brilus" or "Ms. Brilus"), and CASSANDRA NICOLAS (hereinafter referred to as "Plaintiff Nicolas" or "Ms. Nicolas") (collectively, "Plaintiffs"), by and through their undersigned counsel, hereby complain of Defendants, PATRICIA BATCHELDER ("Batchelder") and JOHN ESPINAL ("Espinal") (collectively "Defendants"), and allege as follows:

## **INTRODUCTION**

1. This case involves two black individuals who were subjected to unlawful discrimination on the basis of their race, a hostile work environment, and retaliation by their employer.

2. Plaintiffs seek monetary relief to redress Defendants' unlawful employment practices in violation of 42 U.S.C. § 1981 *et seq.* ("Section 1981"), and Defendants' deprivation of Plaintiffs' civil right to pursue equal employment opportunities.

## PARTIES

3.   Ms. Brilus is a black individual residing in Broward County, Florida.

4.   Ms. Nicolas is a black individual residing in Miami-Dade County, Florida.

5.   Defendant PATRICIA BATCHELDER was employed by Millenium Clinic of Dade Inc. (the "Company") and served as its Chief Executive Officer. Batchelder supervised Plaintiffs and acted within the scope of her employment at all relevant times, and upon information and belief, resides in Broward County, Florida.

6.   Defendant JOHN ESPINAL was employed by the Company and served as its Vice President and Secretary. Espinal supervised Plaintiffs and acted within the scope of his employment at all relevant times, and upon information and belief, resides in Broward County, Florida.

7.   Defendants employed Plaintiffs at the Company's Pembroke Pines location at 1152 N University Drive, Pembroke Pines, FL 33024 (the "Pembroke Pines location"), and their Miami-Dade location at 500 NW 165th Street, Ste. 100, North Miami, FL 33169 (the "Dade location").

## JURISDICTION AND VENUE

8.   This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1367. This action is authorized and instituted pursuant to 42 U.S.C. § 1981.

9.   Venue is proper in this district pursuant to 28 U.S.C. §1391(b) because the unlawful employment practices alleged below were committed within the jurisdiction of the United States District Court for the Southern District of Florida. The Defendants were and are still located in this judicial district and a substantial part of the events or omissions giving rise to

this action, including the unlawful employment practices alleged herein, occurred in this district.

<u>**ADMINISTRATIVE PREREQUISITES**</u>

10.     Plaintiffs are timely commencing this action within four (4) years of the date of Defendants' unlawful conduct.

<u>**FACTUAL ALLEGATIONS**</u>

11.     At all times material, Tish Batchelder was an individual non-black female who was employed by the Company as CEO. At all times material, Batchelder held supervisory authority over Plaintiffs, including the power to hire, fire, demote, and promote Plaintiffs.

12.     Batchelder further held the responsibilities of the Company's Human Resources ("HR") department with regards to complaints and reports of discrimination, harassment, or other unlawful conduct.

13.     At all times material, Espinal was an individual non-black male who was employed by the Company as Vice President, Secretary, and Program Administrator. At all times material, Espinal held supervisory authority over Plaintiffs, including the power to hire, fire, demote, and promote Plaintiffs.

14.     At all times material, Daylied Espinal ("Day") was an individual non-black female who was employed by the Company as Clinical Director for the Dade location. At all times material, Day held supervisory authority over Plaintiffs, including the power to hire, fire, demote, and promote Plaintiffs.

15.     At all times material, Ms. Brilus was a black individual and was therefore a protected class member.

16.     At all times material, Ms. Nicolas was a black individual and was therefore a protected class member.

17.     In or around December of 2020, the Company hired Ms. Brilus as a Psychosocial Rehabilitation Group Facilitator at the Pembroke Pines location.

18.     In or around April 14, 2022, the Company hired Ms. Nicolas as a Group Facilitator at the Pembroke Pines location.

19.     At all times material, Ms. Brilus was considered an exemplary employee and had a record of positive performance.

20.     At all times material, Ms. Nicolas was considered an exemplary employee and had a record of positive performance, too.

**Defendants Transfer Plaintiffs to the Company's Dade Location and Subjects them to Unlawful Conduct, including Discrimination, a Hostile Work Environment, and Retaliation**

30.     In or around July 17, 2023, Defendants recognized Ms. Nicolas' excellent performance and promoted her to Admission Coordinator at Defendants' Dade location, transferring her from the Pembroke Pines location to the Dade location.

31.     Ms. Nicolas heard rumors about the hostile work environment at the Dade location from her Pembroke Pine location colleagues.

32.     Batchelder even told Ms. Nicolas that Espinal was tough to handle and seemingly only hired "big-breasted Latinas." Although Ms. Nicolas was skeptical to begin working in the Dade location, she was not dissuaded from excelling in her new role.

33.     Defendants first subjected Ms. Nicolas to hostile conduct around the onset of her employment in the Dade location.

34.     In or around August 15, 2023, Carlos Rey ("Carlos"), employed by the Company, handed Ms. Nicolas a business card to a gastric bypass surgeon stating that Ms. Nicolas was too fat, and she needed to become skinnier.

35.     Ms. Nicolas was disgusted with Carlos' inappropriate comments, so she reported Carlos to Defendants, but Defendants took no meaningful action.

36.     Ms. Nicolas took a few days off from work because of the damage this interaction caused to her mental health.

37.     In or around August 18, 2023, upon returning to work, Germaine Adderly, employed by the Company, told Ms. Nicolas that if her coworkers could not tell her she was too fat, then she would not be able to speak to anybody about her weight. Again, Ms. Nicolas was simply attempting to perform the duties of her job, but the Company's employees continued to mock her for her weight.

38.     Later that day, Ms. Nicolas complained to Dalila Morejon ("Dalila"), a non-black individual employed by the Company as Billing Coordinator, about the comments Germaine and Carlos made to her. Dalila responded that Ms. Nicolas needed "to stop acting like a ***Fuck Nigga***" and fight back.

39.     Ms. Nicolas was speechless that the Company's non-black employee called her a "***Fuck Nigga***" while she was complaining of hostile treatment. Ms. Nicolas was so shocked that she had no idea how to respond and continued to work.

40.     Ms. Nicolas then reported Dalila's use of racially disparaging slurs to Defendants, but they took no corrective action, seemingly encouraging and permitting the use of racial slurs.

41.     In or around August 24, 2023, Megan Potter ("Potter"), a non-black female employed by the Company as Clinical Director, shared an office with Ms. Nicolas. Potter turned

to Ms. Nicolas while laughing, and remarked, "Oh my god Cassandra, I was writing about something being BIGGER and I almost put **NIGGER** instead!"

42.     Ms. Nicolas was appalled. Within two weeks, two of the Company's employees mocked Ms. Nicolas because of her weight, and two other of the Company's employees explicitly directed the most severe racial slur towards her.

43.     Ms. Nicolas quickly realized that the rumors were true: the Company's Dade location was overflowing with hostility and unlawful activity.

44.     Ms. Nicolas again reported the use of the word "*nigger*" to Defendants, but they failed to take any corrective action.

45.     In or around September 29, 2023, Ms. Nicolas became very ill and experienced painful flare-ups throughout her entire body.

46.     Ms. Nicolas took a few days off to address her illness, but Espinal started to criticize her absences rather than offer her support.

47.     Espinal discussed Ms. Nicolas' absences with Potter by claiming he did not believe she was sick, rather she was just too fat. Espinal disregarded Ms. Nicolas' medically-cleared absences and took the opportunity to mock her weight behind her back.

48.     In or around November 2023, the Company recognized Ms. Brilus' positive work performance and promoted her to Associate Director of Clinical Services, transferring her from the Pembroke Pines location to the Dade location.

49.     Defendants assigned Ms. Brilus to share an office with Ms. Nicolas.

50.     Similar to Ms. Nicolas, Ms. Brilus also heard rumors about the hostile work environment at the Dade location from her Pembroke Pine location colleagues.

51.     In or around November 13, 2023, Ms. Brilus' first day at the Dade location, Espinal introduced himself to Ms. Brilus. Espinal switched from English to Spanish in his introduction, but Ms. Brilus responded in English. Ms. Brilus' failure to respond in Spanish clearly upset Espinal, as he stated, "you don't speak Spanish?!" Ms. Brilus confirmed she did not speak Spanish, and Espinal walked away after becoming offended by her comment.

52.     Later that day, Espinal called Ms. Brilus into his office and pointed to Ms. Nicolas before stating, "just make sure to stay away from that *girl* and her negativity."

53.     Espinal then began to undermine Ms. Brilus' role by conducting client meetings without her, which was a key part of her job duties, and replaced her with Barbarita Orozco ("Barbarita"), a non-Black individual, in these meetings despite Barbarita's lack of experience.

54.     Ms. Brilus was confused as to why Espinal was so unwelcoming, but she was determined to prove herself in the new location by continuing to perform her duties at or above the Company's expectations.

55.     In or around November 17, 2023, Ms. Nicolas and the Company's receptionist had a brief verbal altercation. Espinal chimed in by stating, "when the rooster leaves the hen house for one second, you hens start picking at each other… the receptionist must be on her period today." Batchelder further interjected, "DADDY is on vacation, he needs to be left alone." To be clear, Batchelder referred to Espinal as "Daddy" in the workplace.

56.     Ms. Nicolas could not believe Espinal's despicable, sexist comments, which were endorsed by Batchelder. Espinal was a supervisor, but he handled internal conflict with discriminatory, degrading, and unlawful language. Plaintiffs both found Batchelder's reference to Espinal as "Daddy" to be incredibly disturbing and inappropriate.

57.     In or around November 21, 2023, two of the Company's non-black employees began shouting at one another in front of the staff members. Dalila screamed at the top of her lungs, "I WILL FUCKING DRAG YOU, YOU STUPID BITCH! ALL ACROSS THIS BUILDING!" Plaintiffs understood there was hostility in the Company's workplace, but were shocked by Dalila's verbal threats of physical harm to another employee.

58.     Defendants did not discipline Dalila for her conduct.

59.     Following this altercation, Espinal called Ms. Brilus into his office. Instead of discussing the two non-black employees' actions, Espinal decided to denigrate the black receptionist's character and tried to blame her for the shouting match. Ms. Brilus explained that the black receptionist had no involvement in the dispute, but Espinal responded that the black receptionist was a "***ghetto girl***" and she was solely to blame. Ms. Brilus explained that Espinal was incorrect, but he disregarded Ms. Brilus before again stating that he knew it was the "***ghetto girl's***" fault.

60.     Ms. Brilus told Espinal that the term "***ghetto girl***" was discriminatory and asked him not to use that language, but he ignored her.

61.     In or around January 4, 2024, Espinal verbally berated Helicie Montilus ("Helicie"), a black, Haitian-American female employed by Defendant as a Medical Assistant. Espinal screamed at Helicie to the point where she was on the verge of tears and was physically unwell. Ms. Nicolas and Ms. Brilus comforted Helicie by speaking with her in Haitian Creole, as it was a comforting native language for Ms. Nicolas, Ms. Brilus, and Helicie.

62.     Espinal approached the three black, Haitian-American women and mocked their native language before commanding that they "stop speaking Creole" and "speak a language everybody can understand." Espinal and other Spanish-speaking employees spoke Spanish among

themselves every day, showing no concern that many employees could not understand the language, yet Espinal objected to an incidental use of Haitian Creole in the workplace.

63.     In or around January 10, 2024, Solimar Morejon ("Solimar"), a non-black female employed by Defendant, told Ms. Nicolas that Espinal made further comments about Ms. Brilus, Helicie, and Ms. Nicolas. Solimar stated that Espinal warned not to trust the "***black girls***."

64.     Ms. Nicolas was disgusted by Espinal's blatant racism and disclosed this message to Ms. Brilus. Plaintiffs regularly confided in one another regarding Defendants' unlawful and discriminatory conduct in order to offer emotional support to one another.

65.     Plaintiffs reported Espinal's racist comment to Batchelder, who took no meaningful action and did not discipline or reprimand Espinal.

66.     The following day, Solimar asked Ms. Nicolas to braid her hair. Ms. Nicolas stated she did not know how to braid hair, and Solimar responded that she was shocked because "all of you ***black*** girls usually do, what the fuck!"

67.     Ms. Nicolas could not tolerate the clear racism in the workplace, so she wrote an email to Batchelder regarding the issues with the Dade location's workplace.

68.     Following Ms. Nicolas' email, in or around January 10, 2024, Batchelder informed Ms. Brilus that she was being moved to a new office away from Ms. Nicolas. Ms. Brilus asked to take her current, larger desk into the new office, but Batchelder denied the request. Moments later, Espinal gave Solimar permission to take Ms. Brilus' larger desk.

69.     In or around January 16, 2024, several of Ms. Brilus' team members told her that Espinal was speaking to the staff about terminating Ms. Brilus, and that he made racially disparaging remarks about her behind her back.

70.     In or around February of 2024, Espinal falsely accused Michael Wright ("Michael"), a black individual employed by the Company, of attendance issues. Around the same time, Espinal accused Michael and Delpierrot Jean-Louis ("Delpierrot"), a black Haitian-American individual employed by Defendant, of being unhappy around the clients.

71.     Espinal held a meeting to discuss these accusations with Michael and Delpierrot, and Michael accused Espinal of being racist. Both Michael and Delpierrot told Ms. Brilus that they believed Espinal was making false accusations because of their race and skin color, as Espinal did not bring up these issues to non-black employees. Ms. Brilus confirmed Michael and Delpierrot's suspicion, explaining that Espinal had made numerous racist remarks to herself and Ms. Nicolas, and that he treated her worse because she was a black woman.

72.     In or around February 16, 2024, Espinal was on vacation and Barbarita undermined Ms. Brilus by making clinic decisions without her. Ms. Brilus should have been included in these decisions, as her duties included overseeing aspects of the clinic, but Barbarita left Ms. Brilus out altogether.

73.     Later that day, Ms. Brilus emailed Batchelder, stating, "since starting this position, I have continued to be undermined and questioned about the choices and decisions that I have made. The people who constantly question me are Espinal and especially Barb[arita]. I am constantly left out of meetings, group chats are started without me in them, and decisions are often made without my clinical input."

74.     Batchelder did not respond to Ms. Brilus' email.

75.     In or around February 20, 2024, when Espinal returned to work, Ms. Brilus had a meeting with Espinal and Barbarita to resolve any confusion in their roles and hierarchy. Following the meeting, Espinal ignored Ms. Brilus and continued to leave her out of client meetings.

76.     In or around February 21, 2024, Ms. Brilus walked by Espinal's office as he and Barbarita were having an open-door conversation. As Ms. Brilus walked by, she heard Espinal say, "***these Haitians have got to go.***"

77.     Ms. Brilus was repulsed by these vile, discriminatory comments. Mr. Brilus shared this information with Ms. Nicolas, who was equally repulsed.

78.     In or around February 26, 2024, another one of Defendant's employees, Julia Pierre, told Ms. Brilus that Barbarita and Espinal were gossiping about Ms. Brilus and making racist and disrespectful comments about Ms. Brilus. Ms. Brilus felt humiliated, but at this point she was not surprised by Defendant's conduct.

79.     In or around February 29, 2024, Solimar complained to Ms. Nicolas about Delpierrot's work performance, saying "this ***nigger*** is late again!" Ms. Nicolas was disgusted, and said that his name was Delpierrot, to which Solimar responded, "***y'all*** have names that nobody can pronounce." Both Ms. Brilus and another employee for the Company, Jose Koivu were present for this entire interaction, and were disgusted by Solimar's discriminatory comments.

80.     In or around March 1, 2024, Plaintiffs heard Espinal made a comment to Solimar, stating, "You must be on your period. You know how you women are when you are on your periods." Espinal continued to mock Solimar by rubbing his stomach and making childish faces at her.

81.     Plaintiffs did not know who to report this conduct to, because each time they had reported racist, unlawful comments to Batchelder, they were previously disregarded, and the comments continued.

82.     In or around March 5, 2024, Ms. Brilus raised concerns with Espinal about a potential HIPAA violation he was committing. Espinal became physically upset, shaking with rage,

before shouting, "*you HAITIAN WOMEN think you can tell me what to do around here?!*" Ms. Brilus left the room to diffuse the situation.

83.     Later that same day, Ms. Brilus and Ms. Nicolas were talking about Espinal's conduct while speaking Haitian Creole, and Espinal walked into the room in an aggressive manner. Espinal started to make sounds of confusion, then began mocking Plaintiffs' native tongue, before announcing that Haitian Creole was now banned in the workplace, and speaking Haitian Creole would be grounds for termination.

84.     Shortly thereafter, in or around March 14, 2024, Batchelder accused Ms. Brilus and Ms. Nicolas of committing fraud, following Espinal's complaints of them. Plaintiffs successfully defended and justified their conduct, and Batchelder responded, "no need to be defensive."

85.     Despite Defendant's hostility and unlawful activity, Plaintiffs continued to perform their work to the best of their abilities.

86.     In or around March 21, 2024, Batchelder notified Ms. Nicolas via email that she was content with Ms. Nicolas' work.

87.     In or around March 25, 2024, Ms. Nicolas heard Espinal speaking to Solimar about hiring a new receptionist. When Espinal learned that the new receptionist would be a black woman, he stated, "well I prefer a Spanish speaker, but I hope she's not like one of *those* that we had before." Again, Espinal was openly discussing his opposition to black, Haitian women by stating he preferred to hire non-black, non-Haitian individuals.

## Defendants Wrongfully Terminate Ms. Brilus

88.     Around late March of 2024, Ms. Brilus learned that Defendants were paying her and Ms. Nicolas, who both possessed a master's degree, less than Barbarita, who possessed a bachelor's degree. Plaintiffs raised this concern to Batchelder, who disregarded them.

89.     In or around April 1, 2024, Ms. Brilus complained about race discrimination to Batchelder, Espinal, and Day via email.

90.     Ms. Brilus' email stated, in part, as follows:

> I am emailing you to report a concern that continues to occur in the office. This has been an ongoing issue from the start of my employment at the Miami-Dade location… This is not the first time I have been called defensive when attempting to speak up for myself. When others do the same they are praised for speaking up for themselves. However, when I speak up, I am labeled as angry, defensive and illogical. The angry black woman stereotype keeps getting attributed to my characteristics as [opposed] to the offensive situations in the office. Although, there was an insinuation that I should not turn to my superiors, I will continue to do so as it is your responsibility to sort out these inappropriate behaviors.

91.     Instead of taking meaningful corrective action, Defendants further made Ms. Brilus feel inferior and powerless. Batchelder told Ms. Brilus that she needed to be more aggressive, yet in reality, when Ms. Brilus was more aggressive, they painted her as the stereotypical "angry black woman."

92.     In or around April 2, 2024, Batchelder, Espinal, Barbarita, and Day held a meeting with Ms. Brilus to address her concerns of race discrimination. At this meeting, Ms. Brilus was not able to effectively communicate her concerns because Espinal repeatedly interrupted her, and Barbarita shifted the focus of the meeting away from Ms. Brilus' concerns.

93.     Espinal then assigned Ms. Brilus the task of walking around the floor of the department every hour to conduct a standard check of the premises -- an assignment that no other Associate Director of Clinical Services was tasked with.

94.     Later that day, Ms. Brilus again emailed Batchelder, Espinal, and Day, stating, in part, as follows:

> I continue to feel unheard… I reflected on the task of walking around every hour. I continue to come to the same conclusion, no clinical director has ever been ask[ed] to do so.  In addition, Espinal continues to question what myself and [Ms. Nicolas] are discussing in the room throughout the day. If our work quality is not

in question, how is it appropriate to continue to ask these questions… How are [Ms. Nicolas and I] not to feel narrated and targeted, when every opportunity is taken to bring it up. Unfortunately, during the [4/2/24] meeting, I was unable to share my thoughts due to Espinal's interruptions. The reason I said what I said about being painted as the angry black woman, is because I am, even when I don't raise my voice, I was made to feel as though I was in the wrong… I've heard it time and time again from Espinal when a black woman gets upset in the office she is called *ghetto*, and that she's acting like one of *those*… which is a direct quote and I refuse to be part of a stereotype.

95.     In or around the morning of April 3, 2024, Day responded to Ms. Brilus that "we do hear you, see you, and want you to feel empowered."

96.     Several hours later, around 2:30 P.M., Batchelder called Ms. Brilus into Espinal's office and terminated her, effective immediately.

97.     To be clear, Defendants terminated Ms. Brilus just one (1) day following her final complaint of discrimination.

98.     Ms. Brilus asked if she was terminated for complaining about harassment and discrimination, and Batchelder responded, "you just don't seem happy here and you called our company racist. We don't appreciate that."

### Defendants Wrongfully Terminate Ms. Nicolas

99.     Ms. Nicolas was terrified and felt vulnerable that one of her only companions was terminated for standing up against racism and discrimination.

100.    In or around early April 2024, Batchelder assigned Ms. Nicolas additional tasks to perform during the day. Ms. Nicolas explained to Day that she could not perform her regular duties in addition to the added tasks, but Day insisted she complete the new assignments. Upon completing the assignments, Ms. Nicolas had no time to complete her ordinary duties, and was criticized for her inability to complete all standard assignments.

101.    Ms. Nicolas emailed Defendants, explaining that she believed Day was assigning her more work because she was a black woman and she had complained of unlawful discrimination and harassment.

102.    In or around April 4, 2024, Ms. Nicolas sent an email to Batchelder and Day explaining her concerns and complaints with Defendant. Specifically, Ms. Nicolas stated, "I came to you for a possible solution to the discomfort I feel with Espinal. In lieu of addressing my concerns and finding a resolve, I was given the option to move offices… I continue to not feel secure in my position in the company as you stated, 'If you want to work here, you're gonna have to suck it up.'" Batchelder did not respond.

103.    In or around April 5, 2024, Ms. Nicolas asked if her email was received, but Batchelder did not respond.

104.    In or around April 10, 2024, Ms. Nicolas again emailed Defendant, explaining that, "my previous messages have now gone unanswered for nearly 1 week. I continued to do my job as indicated but the continued disregard for my existing concerns of discrimination and a hostile work environment, are alarming… Please let me know what time is best to discuss."

105.    The very next day, in or around April 11, 2024, Day assigned excessive work to Ms. Nicolas that did not fall under her job description. Day then sent Ms. Nicolas home early, without pay, and claimed Batchelder instructed her to do so.

106.    Again, Ms. Nicolas reported to Batchelder that this was a direct result of her opposition to Defendants' discriminatory and unlawful conduct, but Defendants ignored her.

107.    A few hours after Ms. Nicolas' most recent report of unlawful discrimination and harassment, Defendants terminated Ms. Nicolas.

15

108.     To be clear, Defendants terminated Ms. Nicolas less than one (1) day following her written complaints about discrimination and a hostile work environment, and hours after her final complaint of unlawful activity.

109.     The above-described conduct are just some examples of the discriminatory conduct and retaliation to which Defendants subjected Plaintiffs.

110.     Defendants unlawfully discriminated against Plaintiffs on the basis of their race, and national origin, and retaliated against Plaintiffs for opposing Defendants' unlawful employment practices.

111.     Defendants violated Section 1981 by subjecting Plaintiffs to a hostile work environment, disparate treatment, and retaliation.

112.     At all relevant times, Defendants' employees were acting as agents of Defendants in their discriminatory, retaliatory, and unlawful treatment of Plaintiffs.

113.     At all relevant times, Defendants acted with deliberate indifference to the discriminatory treatment, hostile work environment, and retaliation complained of herein.

114.     As a result of the Defendants' actions, Plaintiffs felt extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

115.     As a result of the acts and conduct complained herein, Plaintiffs have suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits, and other compensation which such employment entails, and Plaintiffs have also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiffs have further experienced severe emotional and physical distress.

116.     Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, so as to support and justify an award of punitive damages against Defendants.

117.     Defendants are either directly or vicariously responsible for the unlawful facts and conduct complained of herein.

**CAUSES OF ACTION**
**COUNT I**
**42 U.S.C. § 1981**
**RACE DISCRIMINATION**
**(Plaintiff Brilus as against All Defendants)**

118.     Ms. Brilus reincorporates the factual allegations in Paragraphs 11 through 117.

119.     Section 1981 provides in relevant part, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

120.     Section 1981 further provides that the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(b).

121.     Ms. Brilus is a black individual and is therefore a protected class member.

122.     The elements of a prima facie case of disparate treatment are flexible and are tailored on a case-by-case basis to differing factual circumstances.

123.     Defendants subjected Ms. Brilus to discriminatory treatment on the basis of her race. Defendants' discriminatory treatment included, but was not limited to the following: 1)

denying Ms. Brilus the privileges afforded to non-black employees; 2) making racially disparaging comments towards Ms. Brilus and other black individuals in the workplace such as "do not trust the *black girls*," "stop acting like a *Fuck Nigga*," "this *nigger* is late again," "I was writing about something being BIGGER and I almost put *NIGGER* instead," "*ghetto girl*," and "*y'all* have names that nobody can pronounce"; 3) labelling Ms. Brilus as an "angry black woman"; 4) making false accusations against black employees; 5) requiring Ms. Brilus perform more work assignments than her non-black co-workers; 6) assigning unfavorable tasks to Ms. Brilus despite her protests; 7) ignoring Ms. Brilus' work-related questions and comments while undermining her job duties; 8) paying Ms. Brilus less money than her lesser-qualified, non-black colleagues; 9) making false accusations of improper and illegal activity in the workplace against black employees; 10) requiring Ms. Brilus to transfer from her office space; and 11) unlawfully terminating Ms. Brilus' employment, among others.

124.    Defendants targeted Ms. Brilus because she is a black individual. No similarly situated non-black employees endured the discriminatory conduct that Ms. Brilus was forced to endure.

125.    The discriminatory actions of Defendants against Ms. Brilus, as described and set forth above, constitute an adverse employment action for purposes of Section 1981. In subjecting Ms. Brilus to adverse employment actions, Defendants intentionally discriminated against Ms. Brilus with respect to the compensation, terms, conditions, or privileges of her employment.

126.    As a direct and proximate result of Defendants' intentional discriminatory conduct in violation of Section 1981, Ms. Brilus has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Ms. Brilus has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity,

and other intangible damages. Ms. Brilus accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

127.     Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Ms. Brilus' rights under Section 1981, warranting the imposition of punitive damages in addition to compensatory damages.

128.     The conduct of Defendants deprived Ms. Brilus of her statutory rights guaranteed under Section 1981.

129.     Ms. Brilus further requests that her attorney's fees and costs be awarded as permitted by law.

**COUNT II**
**42 USC § 1981**
**HOSTILE WORK ENVIRONMENT**
**(Plaintiff Brilus as Against All Defendants)**

130.     Ms. Brilus reincorporates the factual allegations in Paragraphs 11 through 117.

131.     Section 1981 provides in relevant part, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

132.     Section 1981 further provides that the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(b).

133.     Ms. Brilus is a black individual and is therefore a protected class member.

134.   Defendants' discriminatory conduct was severe or pervasive enough to make any reasonable person of the same legally protected class believe that the conditions of employment were altered, and that the working environment was intimidating, hostile, or abusive.

135.   Defendants' severe and pervasive conduct included, but was not limited to the following: 1) making sexist comments towards Ms. Brilus and other women in the workplace such as Batchelder stating Espinal seemingly only hired "big-breasted Latinas," Batchelder referring to Espinal as "Daddy" and stating "DADDY is on vacation, he needs to be left alone," and Espinal stating "when the rooster leaves the hen house for one second, you hens start picking at each other… the receptionist must be on her period today"; 2) making racially disparaging comments towards Ms. Brilus and other black individuals in the workplace such as "do not trust the *black girls*," "*you Haitian women* think you can tell me what to do around here," "stop acting like a *Fuck Nigga*," "*these Haitians have got to go*," "this *nigger* is late again," "I was writing about something being BIGGER and I almost put *NIGGER* instead," and "*ghetto girl*," "well I prefer a Spanish speaker, but I hope she's not like one of *those*," and "*y'all* have names that nobody can pronounce"; 3) labelling Ms. Brilus as an "angry black woman,"; 4) banning the use of Haitian Creole from the workplace and declaring its use grounds for termination; 5) making false accusations against black employees; 6) requiring Ms. Brilus perform more work assignments than her non-black co-workers; 7) assigning unfavorable tasks to Ms. Brilus despite her protests; 8) ignoring Ms. Brilus' work-related questions and comments while undermining her job duties; 9) paying Ms. Brilus less money than her lesser-qualified, non-black colleagues; 10) making false accusations of improper and illegal activity in the workplace against black employees; 11) requiring Ms. Brilus to transfer from her office space; and 12) unlawfully terminating Ms. Brilus' employment, among others.

136.    Defendants' discriminatory conduct was targeted towards Ms. Brilus because she is a black woman. No similarly situated non-black employees endured the discriminatory conduct that Ms. Brilus was forced to endure.

137.    Defendants' discriminatory conduct towards Ms. Brilus negatively and significantly impacted Ms. Brilus' life. Defendants' conduct made Ms. Brilus feel isolated, embarrassed, and ashamed.

138.    As a direct and proximate result of Defendants' intentional discriminatory conduct in violation of Section 1981, Ms. Brilus has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Ms. Brilus has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages. Ms. Brilus accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

139.    Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of the Ms. Brilus' rights under Section 1981, warranting the imposition of punitive damages in addition to compensatory damages.

140.    The conduct of Defendants deprived Ms. Brilus of her statutory rights guaranteed under Section 1981.

141.    Ms. Brilus further requests that her attorney's fees and costs be awarded as permitted by law.

**COUNT III**
**42 USC §1981**
**RETALIATION**
**(Plaintiff Brilus as Against All Defendants)**

142.    Ms. Brilus reincorporates the factual allegations in Paragraphs 11 through 117.

21

143.     Section 1981 provides in relevant part, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

144.     Section 1981 further provides that the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(b).

145.     Ms. Brilus engaged in a protected activity when she opposed Defendants' unlawful discriminatory conduct on the basis of her race and color and complained about the unlawful discrimination she was experiencing.

146.     In response to Ms. Brilus opposing the discriminatory conduct and asserting her right to enjoy the same employment benefits as every other employee, Defendants retaliated against Ms. Brilus.

147.     Defendants retaliated against Ms. Brilus by engaging in conduct, including but not limited to, requiring Ms. Brilus perform more work assignments than her non-black co-workers; subjecting Ms. Brilus to harsher scrutiny and discipline than her non-black co-workers; disciplining Ms. Brilus under false pretenses; requiring Ms. Brilus to work alongside her harassers; at times, ignoring Ms. Brilus in the workplace; and unlawfully terminating Ms. Brilus' employment, among others.

148.     Defendants took the above-mentioned materially adverse actions, among others, against Ms. Brilus because of her protected activities.

149.     Ms. Brilus reported unlawful discrimination many times throughout her employment, including but not limited to in or around January 10, 2024, February 16, 2024, February 20, 2024, March 14, 2024, April 1, 2024, and finally on April 2, 2024.

150.     In or around April 3, 2024, within one (1) day after Ms. Brilus' final report of unlawful discrimination, Defendants terminated Ms. Brilus, explaining, "you just don't seem happy here and you called our company racist."

151.     Any reasonable employee in Ms. Brilus' position would be dissuaded from opposing discriminatory conduct if they knew that they would be subjected to the kind of treatment that Ms. Brilus was forced to endure.

152.     Defendants' alleged bases for its adverse employment actions against Ms. Brilus are pretextual and have been asserted only to cover up the retaliatory nature of Defendants' conduct.

153.     As a direct and proximate result of Defendants' retaliatory conduct in violation of Section 1981, Ms. Brilus has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Ms. Brilus has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages. Ms. Brilus accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

154.     Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of the Ms. Brilus' rights under Section 1981, warranting the imposition of punitive damages in addition to compensatory damages.

155.     The conduct of Defendants deprived Ms. Brilus of her statutory rights guaranteed under Section 1981.

156.   Ms. Brilus further requests that her attorney's fees and costs be awarded as permitted by law.

## COUNT IV
### 42 USC §1981
### RACE DISCRIMINATION
### (Plaintiff Nicolas as Against All Defendants)

157.   Ms. Nicolas reincorporates the factual allegations in Paragraphs 11 through 117.

158.   Section 1981 provides in relevant part, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

159.   Section 1981 further provides that the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(b).

160.   Ms. Nicolas is a black individual and is therefore a protected class member.

161.   The elements of a prima facie case of disparate treatment are flexible and are tailored on a case-by-case basis to differing factual circumstances.

162.   Defendants subjected Ms. Nicolas to discriminatory treatment on the basis of her race and color. Defendants' discriminatory treatment included, but was not limited to the following: 1) denying Ms. Nicolas the privileges afforded to non-black employees; 2) making racially disparaging comments towards Ms. Nicolas and other black individuals in the workplace such as "do not trust the *black girls*," "stop acting like a *Fuck Nigga*," "this *nigger* is late again," "I was writing about something being BIGGER and I almost put *NIGGER* instead," "*ghetto girl*,"

and "*y'all* have names that nobody can pronounce"; 3) making false accusations against black, employees; 4) requiring Ms. Nicolas perform more work assignments than her nonblack co-workers; 5) assigning unfavorable tasks to Ms. Nicolas despite her protests; 6) ignoring Ms. Nicolas' work-related questions and comments while undermining her job duties; 7) paying Ms. Nicolas less money than her lesser-qualified non-black colleagues; 8) making false accusations of improper and illegal activity in the workplace against black employees; and 9) unlawfully terminating Ms. Nicolas' employment, among others.

163.    Defendants targeted Ms. Nicolas because she is a black individual. No similarly situated non-black employees endured the discriminatory conduct that Ms. Nicolas was forced to endure.

164.    The discriminatory actions of Defendants against Ms. Nicolas, as described and set forth above, constitute an adverse employment action for purposes of Section 1981. In subjecting Ms. Nicolas to adverse employment actions, Defendants intentionally discriminated against Ms. Nicolas with respect to the compensation, terms, conditions, or privileges of her employment.

165.    As a direct and proximate result of Defendant's intentional discriminatory conduct in violation of Section 1981, Ms. Nicolas has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Ms. Nicolas has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages. Ms. Nicolas accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

166.     Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Ms. Nicolas' rights under Section 1981, warranting the imposition of punitive damages in addition to compensatory damages.

167.     The conduct of Defendants deprived Ms. Nicolas of her statutory rights guaranteed under Section 1981.

168.     Ms. Nicolas further requests that her attorney's fees and costs be awarded as permitted by law.

## COUNT V
### 42 USC §1981
### HOSTILE WORK ENVIRONMENT
### (Plaintiff Nicolas as Against All Defendants)

169.     Ms. Nicolas reincorporates the factual allegations in Paragraphs 11 through 117.

170.     Section 1981 provides in relevant part, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

171.     Section 1981 further provides that the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(b).

172.     Ms. Nicolas is black individual, and is therefore a protected class member.

173.     Defendants' discriminatory conduct was severe or pervasive enough to make any reasonable person of the same legally protected class believe that the conditions of employment were altered, and that the working environment was intimidating, hostile, or abusive.

26

174.     Defendants' severe and pervasive conduct included, but was not limited to the following: 1) making sexist comments towards Ms. Nicolas and other women in the workplace such as Batchelder stating Espinal seemingly only hired "big-breasted Latinas," Batchelder referring to Espinal as "Daddy" and stating "DADDY is on vacation, he needs to be left alone," and Espinal stating "when the rooster leaves the hen house for one second, you hens start picking at each other… the receptionist must be on her period today"; 2) making racially disparaging comments towards Ms. Nicolas and other black individuals in the workplace such as "do not trust the *black girls*," "*you Haitian women* think you can tell me what to do around here," "stop acting like a *Fuck Nigga*," "*these Haitians have got to go*," "this *nigger* is late again," "I was writing about something being BIGGER and I almost put *NIGGER* instead," and "*ghetto girl*," "well I prefer a Spanish speaker, but I hope she's not like one of *those*," and "*y'all* have names that nobody can pronounce"; 3) banning the use of Haitian Creole from the workplace and declaring its use grounds for termination; 4) making false accusations against black employees; 5) requiring Ms. Nicolas perform more work assignments than her non-black co-workers; 6) assigning unfavorable tasks to Ms. Nicolas despite her protests; 7) ignoring Ms. Nicolas' work-related questions and comments while undermining her job duties; 8) paying Ms. Nicolas less money than her lesser-qualified, non-black colleagues; 9) making false accusations of improper and illegal activity in the workplace against black employees; and 10) unlawfully terminating Ms. Nicolas' employment, among others.

175.     Defendants' discriminatory conduct was targeted towards Ms. Nicolas because she is a black woman. No similarly situated non-black employees endured the discriminatory conduct that Ms. Nicolas was forced to endure.

176.     Defendants' discriminatory conduct towards Ms. Nicolas negatively and significantly impacted Ms. Nicolas' life. Defendants' conduct made Ms. Nicolas feel isolated, embarrassed, and ashamed.

177.     As a direct and proximate result of Defendants' intentional discriminatory conduct in violation of Section 1981, Ms. Nicolas has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Ms. Nicolas has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages. Ms. Nicolas accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

178.     Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of the Ms. Nicolas' rights under Section 1981, warranting the imposition of punitive damages in addition to compensatory damages.

179.     The conduct of Defendants deprived Ms. Nicolas of her statutory rights guaranteed under Section 1981.

180.     Ms. Nicolas further requests that her attorney's fees and costs be awarded as permitted by law.

**COUNT VI**
**42 USC §1981**
**RETALIATION**
**(Plaintiff Nicolas as Against All Defendants)**

181.     Ms. Nicolas reincorporates the factual allegations in Paragraphs 11 through 117.

182.     Section 1981 provides in relevant part, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for

the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

183.    Section 1981 further provides that the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(b).

184.    Ms. Nicolas engaged in a protected activity when she opposed Defendants' unlawful discriminatory conduct on the basis of her race and complained about the unlawful discrimination she was experiencing.

185.    In response to Ms. Nicolas opposing the discriminatory conduct and asserting her right to enjoy the same employment benefits as every other employee, Defendants retaliated against Ms. Nicolas.

186.    Defendants retaliated against Ms. Nicolas by engaging in conduct, including but not limited to, requiring Ms. Nicolas perform more work assignments than her non-black co-workers; subjecting Ms. Nicolas to harsher scrutiny and discipline than her non-black co-workers; disciplining Ms. Nicolas under false pretenses; requiring Ms. Nicolas to work alongside her harassers; at times, ignoring Ms. Nicolas in the workplace; and unlawfully terminating Ms. Nicolas' employment, among others.

187.    Defendants took the above-mentioned materially adverse actions, among others, against Ms. Nicolas because of her protected activities.

188.    Ms. Nicolas reported unlawful discrimination many times throughout her employment, including but not limited to in or around January 10, 2024, February 16, 2024, February 20, 2024, March 14, 2024, April 4, 2024, and finally on April 10, 2024.

189.     Following Ms. Nicolas' report of unlawful discrimination on April 4, 2024, Batchelder responded, "If you want to work here, you're gonna have to suck it up."

190.     In or around April 10, Ms. Nicolas emailed Batchelder explaining that "my previous messages have now gone unanswered for nearly 1 week. I continued to do my job as indicated but the continued disregard for my existing concerns of discrimination and a hostile work environment, are alarming… Please let me know what time is best to discuss."

191.     In or around April 11, 2024, within one (1) day after Ms. Nicolas' final report of unlawful discrimination, Defendants terminated Ms. Nicolas.

192.     Any reasonable employee in Ms. Nicolas' position would be dissuaded from opposing discriminatory conduct if they knew that they would be subjected to the kind of treatment that Ms. Nicolas was forced to endure.

193.     Defendants' alleged bases for its adverse employment actions against Ms. Nicolas are pretextual and have been asserted only to cover up the retaliatory nature of Defendants' conduct.

194.     As a direct and proximate result of Defendants' retaliatory conduct in violation of Section 1981, Ms. Nicolas has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Ms. Nicolas has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages. Ms. Nicolas accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

195.     Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of the Ms. Nicolas' rights under Section 1981, warranting the imposition of punitive damages in addition to compensatory damages.

196.    The conduct of Defendants deprived Ms. Nicolas of her statutory rights guaranteed under Section 1981.

197.    Ms. Nicolas further requests that her attorney's fees and costs be awarded as permitted by law.

### **JURY DEMAND**

Plaintiffs hereby demand a jury trial on all issues to be tried.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request this Court enter judgment against Defendants for all damages suffered by the Plaintiffs, including economic damages, lost wages (back pay and front pay) and benefits, liquidated damages, statutory damages, compensatory damages, emotional distress damages, punitive damages, interest, attorney's fees and costs, disbursements of action, and any other remedies (monetary and/or equitable) allowable by law as a result of the Defendants' conduct in violation of Section 1981.

Dated: Miami, Florida
       October 14, 2025

**DEREK SMITH LAW GROUP, PLLC**
*Counsel for Plaintiffs*

*/s/ Daniel J. Barroukh*
Daniel J. Barroukh, Esq.
Florida Bar No.: 1049271
Derek Smith Law Group, PLLC
520 Brickell Key Drive, Suite O-301
Miami, FL 33131
Tel: (305) 946-1884
Fax: (305) 503-6741
Danielb@dereksmithlaw.com